**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ANGELA W.,[1]                                          Case No. 1:23-cv-576

              Plaintiff,                                    Bowman, M.J.
      v.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents four claims of error for this Court's review.[2] The Court REVERSES the ALJ's finding of non-disability because it is not supported by substantial evidence in the record as a whole, and REMANDS for further consideration under sentence four.

**I.  Summary of Administrative Record**

On September 15, 2020, Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging a disability onset date of January 17, 2019 -  a date coinciding with a serious cardiac event in which Plaintiff was revived by EMS. Plaintiff alleges that she is disabled based on a combination of physical impairments including COPD, congestive heart failure and related issues, back issues, a microvascular stroke that

---

[1]Due to significant privacy concerns in social security cases, this Court refers to claimants only by their first names and last initials. *See* General Order 22-01.
[2]The parties have consented to final disposition before the undersigned. See 28 U.S.C. § 636(c).

occurred on October 30, 2020, and major depression and anxiety. (Tr. 204). After her application was denied at the initial level and on reconsideration, she sought an evidentiary hearing before an administrative law judge ("ALJ"). On May 3, 2022, Plaintiff appeared at a telephonic hearing with counsel and gave testimony before ALJ Laura Chess; a vocational expert ("VE") also testified. (Tr. 43-69).

Plaintiff was considered a "younger individual" at 46 years old on her alleged disability onset date, and remained in that same age category through the date of the ALJ's decision.[3] (Tr. 34). She lives in a house with her youngest son and her boyfriend. (Tr. 217). She has a high school degree with about one year of additional training in medical billing/coding, with past relevant work as a receptionist. (Tr. 20). However, that work was years prior to her disability onset date; she has not worked as in any substantial gainful activity ("SGA") since March 2008.[4]

On June 24, 2022, ALJ Chess issued an adverse written decision that concluded that Plaintiff was not disabled through the date of her decision. (Tr. 14-36). The ALJ acknowledged that Plaintiff has many severe impairments including: "heart disease with mitral valve stenosis, atrial fibrillation, congestive heart failure, and cardiac implant; chronic obstructive pulmonary disease with asthma; abducens nerve disease; hypertension; hyperlipidemia; peripheral vascular disease; gastroesophageal reflux disease; lumbar spine degenerative changes." (Tr. 20). The ALJ also noted nonsevere

---

[3]In her reply memorandum, Plaintiff asserts that she has progressed to the next age category of "closely approaching advanced age." At age 50, different Grid rules apply that make it easier to prove disability. Contrary to Plaintiff's assertion, however, Plaintiff did not attain the age of 50 until *after* the ALJ rendered her decision. This Court considers the record only as it existed on the date of the Commissioner's decision.
[4]Plaintiff testified to part-time work at a retail shop in 2015 and 2016 at a level below SGA.

physical impairments of obesity,[5] an ulcer of the left calf, hemorrhoids, and a colon polyp, along with nonsevere mental impairments of anxiety and depression. (Tr. 20-26). Considering all of Plaintiff's severe and nonsevere impairments, the ALJ determined that none, either alone or in combination, meets or medically equals any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 26).

In her decision, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of light work,[6] with the following additional limitations:

> (1) lifting and carrying no more than 20 pounds occasionally and ten pounds frequently; (2) no climbing ladders, ropes, or scaffolds; (3) no more than occasional climbing of ramps or stairs; (4) able to frequently balance (as defined in the Selected Characteristics of Occupations as published by the United States Department of Labor); (5) no more than occasional stooping, kneeling, crouching, or crawling; (6) no exposure to extreme heat or extreme cold; (7) no concentrated exposure to humidity or atmospheric conditions (as defined in the Selected Characteristics of Occupations as published by the United States Department of Labor); (8) no exposure to moving mechanical parts or high exposed places.

(Tr. 28).

Based upon Plaintiff's age, education, and RFC, and considering testimony from the vocational expert, the ALJ first concluded that Plaintiff could perform her past relevant work as a receptionist. (Tr. 33). Alternatively, the ALJ determined that Plaintiff remained capable of performing other jobs that exist in significant numbers in the national economy at the light exertional level, including the representative unskilled positions of routing clerk, marking clerk, and inspector. (Tr. 35). In yet another alternative finding, the ALJ

---

[5]The ALJ noted that Plaintiff's BMI "was not consistent with actual obesity for any continuous period of at least 12 months' duration." (Tr. 21).
[6]Light work includes the ability to sit, and to stand/walk, up to six hours each during a given eight-hour workday.

determined that - even if further limited to the sedentary level of exertion - Plaintiff remained capable of performing the additional representative positions of inspector, bench assembler, and packager. (Tr. 35). Therefore, the ALJ determined that Plaintiff was not under a disability. (Tr. 36). The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In this appeal, Plaintiff argues that the ALJ erred: (1) by failing to adequately consider and account for Plaintiff's mental impairments; (2) by improperly assessing the opinion evidence; (3) by over-relying on Plaintiff's daily activities without crediting her subjectively reported limitations on those activities; and (4) based on the first three errors, by failing to support her decision with substantial evidence.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In

4

conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v.  Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must

present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### B. Relevant Medical Evidence

Plaintiff's alleged onset of disability coincides with a January 2019 hospitalization and mitral valve replacement. (S*ee* Tr. 687-691). Her records reflect a long history of cardiac-related issues beginning in 2012. (*See generally*, Tr. 1921, noting mild mitral valve issues in 2012 and stent in 2015). The record reflects the increasing severity of Plaintiff's cardiac condition over time.

In May 2019 she underwent implantation of a loop recorder. In August 2019, Plaintiff reported "mild shortness of breath and occasional lightheadedness" and fatigue. (Tr. 466; *see also* Tr. 468). By March 2020, cardiology records reflect she was doing relatively well, with overall improvement in cardiac symptoms.

In August 2020, she reported to the ED for back pain, reportedly after moving around furniture earlier in the week. (Tr. 425). She was found to have decreased range of motion in her lumbar back and tenderness. (*Id*.; *see also* Tr. 431-432, noting radiculopathy with abnormal gait).

In October 2020, she had a microvascular stroke that caused a left eye palsy. (Tr. 1476). In February 2021, she presented with worsening cardiac symptoms including swelling of her hands and intermittent episodic chest pain. (Tr. 1475). In March 2021, she had her loop recorder removed due to pain. (See Tr. 1471, 1475). In May 2021, Plaintiff was briefly admitted to the hospital for chest pain. (Tr. 1535). At the time, she exhibited

normal motor and sensory function and no extremity edema, but reported shortness of breath with walking and fatigue. (Tr. 1540-1541).

On September 29, 2021, she again presented to the ED with chest pain as well as diarrhea, and again was briefly admitted. At the time, she stated that her pain was worse with exertion such as walking to the mailbox. (Tr. 1706, 1708). She was discharged after her renal functions improved with IV hydration, with full resolution of her chest pain and diarrhea. (Tr. 1721).

On March 3, 2022, her treating cardiologist, Dr. Stultz, noted that "she does have some shortness of breath, fatigue…consistent with diastolic heart failure as ejection fraction is normal." (Tr. 1918). He notes that her current complaints include chest pain, episodic dizziness coupled with leg weakness, anxiety, and "difficulty standing for prolonged periods of time." (Tr. 1920). In his clinical judgment, he opines that she "[e]ssentially functions at a New York Heart Association class III, multifactorial." (Tr. 1918). With respect to her reported "episodic chest discomforts," Dr. Stultz notes an unclear etiology. (*Id.*) Consistent with the SSI questionnaire completed the same date, Dr. Stultz's note states: "In my opinion, she would have difficulty maintaining a job, due to diastolic CHF symptoms, and she also mentions a significant amount of anxiety which is managed by her primary care physician and psychiatrist." (Tr. 1918).

An April 2022 record reflects continued complaints relating to Plaintiff's degenerative lumbar disease. Despite evidencing a normal gait, clinical examination at that time documented limited hip range of motion, tenderness to palpitation, positive sacral compression testing, and a positive Faber/Patrick maneuver. (Tr. 2163-64; *see also* Tr. 2159, reporting she can only stand, sit, and walk for 5 minutes without pain).

7

With respect to mental health, Plaintiff entered into formal treatment for depression and anxiety following emergency care in May 2019 for suicidal ideation. As discussed below, psychiatric records from September 2019 through January 2022 reflect a total of 14 visits with prescribing Advance Practice Registered Nurse ("APRN") Thorn.

The ALJ acknowledged that Plaintiff's cardiac impairment is her "primary physical impairment" and cited supporting diagnostic evidence without discussion of the clinical findings contained in those records such as exertional fatigue and shortness of breath:

> Medical records confirm that the claimant's primary physical impairment is heart disease with mitral valve stenosis, atrial fibrillation, congestive heart failure, and cardiac implant (Exhibits 2F, 3F at 4, 4F, 6F, 8F, 10F, 14F at 5, 15F at 56, 18F, and 20F). The claimant has a history of stenting and mitral valve replacement in January 2019 (Exhibits 14F at 2, 18F at 22, and 20F at 2). There was evidence of mitral valve prolapse (Exhibit 3F at 776). Cardiac testing revealed left ventricular ejection fraction to be in the range of 55-60 percent (Exhibit 3F at 776). The evidence of record shows that the claimant experiences vocationally relevant functional limitation as a consequence of heart disease.

(Tr. 20-21). The ALJ also briefly referenced Plaintiff's COPD with asthma without significant discussion. (Tr. 21). Last, the ALJ acknowledged Plaintiff's lumbar spine degeneration and treatment for anxiety and depression. (Tr. 21-22).

### C. Plaintiff's Claims of Error[7]

Most of Plaintiff's claims focus on the ALJ's evaluation of her mental impairments, beginning with the ALJ's conclusion that those impairments "would have no more than a

---

[7]Plaintiff's counsel cites solely to PageID numbers rather than to Administrative Transcript. Adding to the confusion, counsel denominates the citations as "Tr." rather than as "PageID." Because PageID citations cannot be easily searched in Social Security cases, Local Rule 8.1(d) requires parties in Social Security cases to "provide pinpoint citations to the administrative record, regardless of whether a party also chooses to provide PageID citations." **Counsel is strongly encouraged to comply with LR 8.1(d) in the future, using "Tr." or "R." to cite to the Administrative Transcript.**

minimal effect" on Plaintiff's ability to perform basic mental work activities at Step 2. (Tr. 18, 35). But in addition to claims challenging the assessment of her mental impairments, Plaintiff argues that the ALJ committed prejudicial error in her assessment of Plaintiff's physical RFC limitations. Because the Court finds the latter claim warrants reversal, the Court begins with the analysis of that claim.

### 1. Error in Consideration of the Physical RFC Opinion Evidence

Rather than assigning a particular "weight" to each opinion under a previously defined hierarchy of medical opinions, current regulations require the ALJ to determine the "persuasiveness" of each prior administrative medical finding or other medical opinion based upon a list of factors, the most important of which are "supportability" and "consistency." *See* 20 C.F.R. § 404.1520c(b)(2). Supportability focuses on the provider's explanations for his or her opinions, including whether the opinions are supported by relevant objective medical evidence (such as lab results or imaging studies) or other supporting explanations. *See* 20 C.F.R. § 416.920c(c)(1). Consistency is defined as the extent to which an opinion or finding is consistent with evidence from other medical or nonmedical sources. 20 C.F.R. § 416.920c(c)(2). An ALJ must explain her analysis of supportability and consistency, but may also consider a medical source's specialization and the relationship the medical source has with the claimant, including the length of treatment, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship. 20 C.F.R. §404.1520c(c)(3-5).

### a. Plaintiff's Cardiologist's Opinions

Plaintiff argues that the ALJ's rejection of the opinions of her treating cardiologist is neither adequately articulated nor substantially supported. The Court agrees.

On a 2-page form completed on March 3, 2022, Dr. Stultz lists Plaintiff's primary cardiac symptoms as shortness of breath and fatigue. Under pertinent medical history, he wrote: "mechanical mitral valve replacement 2019." (Tr. 2088). In response to questions about his exam findings, Plaintiff's diagnoses, and treatment, he wrote "see note," referring to his clinical examination the same date. (*Id.*) In the remainder of the form, Dr. Stultz opines that Plaintiff can stand for only 15 minutes at a time, can sit for just 30 minutes at a time, can lift five pounds "on occasional basis" with no lifting "on a frequent basis," can bend and stoop occasionally, and can work for no more than one hour per day. (Tr. 2088). In another section he opines that Plaintiff would be "off task" as much as 25 percent of the workday and would likely be absent four or more times per month. (Tr. 2089; *see also* Tr. 29).

The ALJ's physical RFC assessment agrees with a small number of Dr. Stultz's "occasional" postural limitations. But the ALJ flatly rejected all work-preclusive opinions as "inconsistent with and unsupported by the medical evidence of record." (Tr. 30). The ALJ reasoned:

> There is no objective evidence to support a conclusion that the claimant can lift only five pounds, that she can stand only 15 minutes at a time, or that she can sit only 30 minutes at a time. There is no logical medical basis for finding that the claimant can work only one hour per day. Similarly, there is no evidence to support a finding that the claimant would be 'off task' as much as 25 percent of the time during a typical workday or that she would be absent from work as much as four days or more per month. Dr. Stultz provided no support from the medical record for any of these conclusions. His assertions in that regard are not consistent with the medical record and are not persuasive. Note, for example, that a physical examination in October 2021 was unremarkable. There were no signs of respiratory distress. Bowel sounds were normal. There was no edema. Heart rate and rhythm were normal. The claimant was in no acute distress (Exhibit 18F at 42). Again, in April 2022, upon examination, the claimant demonstrated normal gait and station. Straight-leg-raise testing was negative. At that time, the claimant was treated with sacroiliac injection but, even so, the extent of

impairment objectively identified would not support the degree of limitation suggested by Dr. Stultz (see Exhibit 20F at 21-22).

(Tr. 30-31.)

Notably, the ALJ did not refer to or discuss the March 3, 2022 note expressly cited by Dr. Stultz as providing the medical basis for his opinions. Dr. Stultz opined in that note that Plaintiff's CHF had progressed to a functional "Class III" under New York Heart Association guidelines. A Class III diagnosis represents a clinical finding of marked functional limitation.[8] Not only did the ALJ fail to discuss that clinical finding, but the October 2021 and April 2022 records on which she relied were routine examinations by a primary care provider that included no assessment of limitations due to cardiac impairment.

The Court agrees that the ALJ's dismissive analysis of Dr. Stultz's opinions as purportedly made without **any** "logical medical basis" or "evidence" or "support" is not substantially supported. The ALJ may disagree with the strength of that evidence[9] but her wholesale denial of its existence is not tenable. On remand, the ALJ should reevaluate the evidence cited by Dr. Stultz, including but not limited to his diagnoses and assessment of Plaintiff's cardiac functional impairment as having progressed to the equivalent of "Class III" based on the longitudinal treatment record and his March 3, 2022 clinical exam. (Tr. 1918). If deemed necessary, the ALJ should seek additional review by a medical consultant.

---

[8]According to the NYHA, Class III translates to "Marked limitation in activity due to symptoms, even during less-than-ordinary activity, e.g. walking short distances (20-100m). Comfortable only at rest." https://manual.jointcommission.org/releases/TJC2018A/DataElem0439.html

[9]There is no evidence of a functional capacity evaluation, and the only exercise testing in the record (stress test) appears to have been conducted prior to the alleged onset of disability. (Tr. 464).

### b. Agency Consulting Physician Opinions

On initial consideration of Plaintiff's application in May 2021, Dr. McKee reviewed Plaintiff's physical health records through March 17, 2021 (prior to her May and September hospital admissions for chest pain) and concluded that Plaintiff retained the exertional ability to perform light work - meaning up to six hours per day of walking/standing and sitting - with additional non-exertional limitations that included frequent balancing, stooping, kneeling, crouching, but only occasional crawling or climbing ramps/stairs. (Tr. 76). Dr. McKee also opined that Plaintiff should avoid "concentrated" exposures to extreme heat or cold, humidity, and fumes, odors, dusts, gasses or poor ventilation, and should avoid all exposure to hazards. (Tr. 77). At the reconsideration level in November 2021, Dr. Gallagher reviewed additional cardiology-related records from Plaintiff's May 2021 hospitalization and cardiology appointments in May/June 2021. Dr. Gallagher adopted all of Dr. McKee's opinions. (Tr. 84-85).

The ALJ succinctly reasoned (without discussion or citation) that both consultants' opinions were "generally persuasive," because "the overall evidence supports a finding that the claimant can perform light-exertion work…." (Tr. 30).[10] On the record presented, this cursory explanation inadequately discusses the "supportability" and "consistency" factors. The Commissioner concedes as much, but argues that Plaintiff "does not show how a more detailed evaluation of their findings would result in a different outcome." (Doc. 9 at PageID 2234).

---

[10]Though the ALJ does not discuss the variance between her RFC as determined, she did not adopt the consultants' "frequent" postural opinions. The ALJ also included greater environmental restrictions.

12

The Court finds prejudicial error. Dr. McKee's review occurred prior to the worsening of Plaintiff's cardiology symptoms, and neither consultant had access to Plaintiff's treating cardiologist's opinions. The relevancy of the most recent evidence coupled with the ALJ's lack of discussion of the same strongly suggests the articulation error was not harmless.

### 2. The ALJ's Assessment of Plaintiff's Mental Impairment

The remainder of Plaintiff's claims attack the ALJ's assessment of her mental health impairment, describing the ALJ's analysis as "inadequate, unreasonable, and unsupported." (Doc. 8 at PageID 2205). The ALJ acknowledged that Plaintiff has been diagnosed with anxiety and depression, for which she has received treatment for more than two years. But Plaintiff first argues that "[t]here is *no discussion* of Plaintiff's mental health treatment records, her specific mental health symptoms, or even her allegations of anxiety and depression." (Doc. 8 at PageID 2205 (emphasis added)). To the extent that the ALJ discussed *any* mental health evidence, Plaintiff further accuses the ALJ of "cherry-picking." In response, the Commissioner argues that Plaintiff's claim asks this Court to reweigh the evidence – something this Court cannot do.

Plaintiff's first argument is hyperbole. The ALJ clearly did include *some* discussion of her alleged mental health symptoms, treatment records, and medical source opinions. (*See* Tr. 20, 22-26). For example, the ALJ briefly summarized her subjective allegations, including that she has not completed a jigsaw puzzle recently, that she lacks energy, that her daily activities have changed, and that she spends more time in her room. (Tr. 20). Moving to Steps 2 and 3 of the sequential analysis, the ALJ next cited to relevant clinical records and the opinion evidence. As required by applicable regulations, the ALJ focused

13

on the four broad functional areas commonly known as the "paragraph B" criteria: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting and maintaining pace; and (4) adapting or managing oneself. The ALJ explained that in order for Plaintiff to establish that her mental impairment was "severe" at Step 2, "the evidence must document a 'moderate' degree of limitation in at least one of the paragraph B areas."[11] (Tr. 24). Because the ALJ found no more than "mild" limitations in each domain, she assessed Plaintiff's mental health impairment as nonsevere. (Tr. 26).

### a.  The ALJ's Discussion of the Clinical Records

After a May 2019 emergency room visit for suicidal ideation. Plaintiff was referred to APRN Thorn for outpatient medication management of her mental health symptoms.[12] Nurse Thorn's notes, dating from September 3, 2019 through January 10, 2022, reflect fourteen 20-30 minute appointments. The ALJ's discussion of Plaintiff's treatment record was as follows:

> [U]pon repeated examination, the claimant exhibited full affect, euthymic mood, normal psychomotor activity, and intact memory. She was cooperative, alert, and fully oriented (Exhibits 5F at 27 [Tr. 1460], 9F at 9 [Tr. 1658], 10F at 72 [Tr. 1731], and 12F at 43 [Tr. 1907]). Thought content and thought process were normal. The claimant demonstrated good insight and good judgment (Exhibits 5F at 3, 7, 9, 12, 15, 18, 21, 24, and 27; 9F at 3, 6, and 9; 12F at 3, 6, 9, 12, 15, 18, 23, 25, 31, 34, 37, 40, and 42). The claimant's mental status was reported to be good (Exhibit 12F at 42).

---

[11]*See* 20 C.F.R. § 404.1520a(d)(1) (explaining that the agency will "generally conclude" that a mental impairment is not severe if the degree of limitation in all four Paragraph B areas is either "none" or "mild.")
[12]Nurse Thorn prescribed medications for anxiety and depression. Plaintiff reported to a consulting psychologist that in addition to medication management by Nurse Thorn, she sees a therapist "weekly or every other week." (Tr. 1502). Of note, Plaintiff did not include any therapy notes other than those generated by Nurse Thorn.

(Tr. 22).[13]

Plaintiff accuses the ALJ of error at Step 2, and further disputes the ALJ's failure to find functional limitations at Step 4.[14] Plaintiff takes particular umbrage to the first sentence of the ALJ's analysis. Specifically, Plaintiff asserts factual error in the description of her mood as "euthymic... 'upon repeated examination.'" (Doc. 8 at PageID 2205). Because two of the ALJ's first four citations refer to the same March 1, 2021 note,[15] Plaintiff complains that the ALJ actually cited to just three records, with only two of those describing her mood as "euthymic" or "normal," (see Tr. 1460, 1731), while the third listed her mood as anxious and depressed. (Tr. 1658). Plaintiff argues that by citing to so few records, the ALJ failed to acknowledge that Nurse Thorn assessed her mood as anxious and/or depressed on eleven other occasions. As a result, Plaintiff accuses the ALJ of "unsustainably drawn conclusions from ...cherry-picked evidence" that is "not even minimally reflective of the contents of Plaintiff's longitudinal mental health treatment records." (Doc. 8 at PageID 2207).

---

[13]The ALJ repeated the same analysis a total of six times in her opinion. (See Tr. 23-26).

[14]A challenge to an ALJ's determination of whether an impairment is "severe" or "nonsevere" at Step 2 of the sequential analysis ordinarily provides no basis for reversal. See Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987). In addition to suggesting that the ALJ's "cherry-picking" of the evidence meets the high bar for Step 2 reversal, Plaintiff argues that the ALJ committed a separate reversible error at Step 4 by failing to discuss limitations even if her mental impairment was not severe. The latter argument is refuted by Emard v. Comm'r of Soc. Sec., 953 F.3d 844, 851-52 (6th Cir. 2020) (citing with approval case law that holds "that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p.").

[15]Exhibit 5F at 27 [Tr. 1460] and Exhibit 12F at 43 [Tr. 1907] are duplicates of the same March 1, 2021 clinical note by Nurse Thorn – a record on which Plaintiff complains that the ALJ over-relied. Given Plaintiff's criticism of the ALJ's citation to a single duplicate, it is ironic that Plaintiff cites to four duplicates of Nurse Thorn's September 7, 2021 clinical note. (See, e.g., Tr. 1651, 1654, 1878, 1881 (original citations to PageID 1681, 1684, 1909, 1912)). On March 1, Plaintiff reported doing so well that Nurse Thorn scheduled follow-up in six months. But at the follow-up appointment on September 21, 2021, Nurse Thorn again assessed Plaintiff's mood as anxious and depressed. (Tr. 1657-1658). As the ALJ noted, an ER record dated a week later, on 9/29/21, again documented a "normal" mood. (Tr. 1731).

This Court reads the ALJ's analysis as a whole, rather than parsing out the ALJ's first few citations. In context, the undersigned does not understand the ALJ to be solely or even primarily focusing on "repeated" examples of a "euthymic mood." Rather, the Court reads the analysis as explaining that the Step 2 finding is supported by "repeated examination[s]" over time that reflect <u>multiple</u> normal and benign mental health findings <u>including</u>: "full affect, euthymic mood, normal psychomotor activity, and intact memory." In other words, the ALJ is not focused on Plaintiff's "mood" alone[16] for her determination that Plaintiff's impairment is not severe, but instead reasons that the wide array of normal mental findings found on "repeated examination" were consistent with no more than "mild" levels of functional impairment in the four paragraph B domains.

In context, the ALJ's citations - the vast majority of which are to Nurse Thorn's notes, (*see* Tr. 22) -  adequately support the ALJ's findings that Plaintiff repeatedly exhibited normal findings in affect, mood, psychomotor activity and memory, and was repeatedly "cooperative, alert, and fully oriented" on exam. (*See* Tr. 1460, 3/1/21 psychiatric note reflecting "euthymic" mood and other normal findings; Tr. 1731, 9/29/21 ER record describing "normal" mood and affect, "normal" memory, and "normal" judgment). In addition to the four citations that draw Plaintiff's ire, the ALJ cites to another 26 pages that reflect similar findings.

Each of Nurse Thorn's 14 notes follows the same format with a single field denoting "mood." It is true that Nurse Thorn assessed Plaintiff's mood as "anxious" and/or

---

[16]To be clear, the existence of even two records depicting Plaintiff's mood as "euthymic" or "normal" is a "repeated" finding. (*See, e.g.*, Tr. 1460 ("euthymic") and Tr. 1731 "normal"). As the Commissioner points out, there are many other examples of a euthymic or normal mood in the record. (*See, e.g.*, Tr. 280, 370, 396, 420, 431, 436, 450, 1477, 1523, 1530, 1541, 1553, 1566, 1576, 1584, 1731, 2053).

"depressed" 11 times.[17] But under the same "MENTAL STATUS EXAM" heading, Nurse Thorn assessed 17 *additional* fields concerning Plaintiff's appearance and dress, gait, speech, thought content, thought process and associations, judgment, insight, alertness and orientation, memory, attention, impulse control, interview behavior, psychomotor activity/involuntary movements, eye contact, affect, language and fund of knowledge. Apart from the occasional "flat" affect, Nurse Thorn repeatedly documented "normal" findings in virtually every other mental status field in every clinical note that she wrote. (*See* Tr. 26, citing Tr. 1436, 1440, 1442, 1445, 1448, 1451, 1454, 1457, 1460, 1652, 1655, 1658, 1867, 1870, 1873, 1876, 1879, 1882, 1887, 1889, 1895, 1898, 1901, 1904, 1907).

To counter this evidence of normal mental status, Plaintiff focuses on narrative portions of the same notes where Nurse Thorn recounts Plaintiff's increased *subjective* complaints about her ongoing struggles with depression and anxiety. This argument presents a closer issue. On the one hand, the ALJ was not required to find more than "mild" functional limitations based solely on Plaintiff's *subjective* reports. But on the other hand, the ALJ's failure to reference *any* of the narrative portions of Nurse Thorn's records leaves the Court unsure of how much (if at all) the ALJ considered them. The narrative portions suggest that Plaintiff's mental impairments waxed and waned over time.[18] Therefore, the Court encourages the ALJ to re-examine the clinical records to determine

---

[17] Two of Nurse Thorn's notes report Plaintiff's mood as "stable." (*See* Tr. 1892, 1869).
[18] (*Compare* Tr. 1460, March 2021 report that Plaintiff was "doing good," "doing well," that therapy was "really helping and I'm just so thankful," *with* Tr. 1651, September 2021 report of "increased anxiety and depression," including daily crying and avoidance of family functions; *see also* Tr. 1657, 1866, 1869).

whether Plaintiff experienced more than "mild" functional mental impairment during any period greater than 12 months.

### b. The Mental RFC Opinion Evidence

In addition to the asserted errors concerning the review of her clinical records, Plaintiff criticizes the ALJ's assessment of the mental RFC opinion evidence. That evidence consists of: (1) a consultative report by examining agency psychologist James Rosenthal, Psy.D.; (2) two Psychiatric Review Technique forms (PRTFs) by non-examining agency consultants dated June 29, 2021 and November 13, 2021; and (3) a mental RFC form completed on March 14, 2022 by Nurse Thorn. The ALJ found the first three opinions to be "persuasive," but rejected Nurse Thorn's opinions as "not persuasive."

Dr. Rosenthal's June 24, 2021 consultative psychological evaluation report was based on his clinical interview and a limited portion of the medical record that referenced ongoing treatment for anxiety and depression. (Tr. 22-23; *see also* Tr. 1503-1505). During the interview, Plaintiff reported that she deals with her own finances, shops, reads, uses the internet, sees friends a few times each week. (Tr. 23, 1504). She also reported "no problems interacting" with others, that she enjoys jigsaw and crossword puzzles and spends time running errands. (*Id.*) Dr. Rosenthal noted that Plaintiff's affect was constricted, and that she reported "problems with depression with a depressed mood, sadness, lack of motivation, lack of energy, and crying spells." (Tr. 1503). But in a section titled "Functional Discussion of Four Work-Related Abilities," the ALJ reasoned that Dr. Rosenthal found "no evidence of" difficulties in any paragraph B domain. (Tr. 23).

In addition to Dr. Rosenthal, two non-examining consultants opined on initial review and on reconsideration that Plaintiff has no limitations in the paragraph B domains of understanding, remembering, or applying information, in interacting with others, or in concentrating, persisting, or maintaining pace. (Tr. 23, 74, 82). Only in the domain of adapting and managing oneself did they assess a "mild" limitation. (*Id.*).

With respect to Dr. Rosenthal, Plaintiff argues that the ALJ overstates his conclusions. She points out that the report states only that Plaintiff "reported no difficulty understanding assigned tasks *on past jobs*," (Tr. 1505, emphasis added), not that she *currently* has no difficulty. But Dr. Rosenthal included within each functional discussion objective clinical observations that add credence to the ALJ's reasonable interpretation. (Tr. 1505).

More persuasively, Plaintiff asserts articulation error as to all three consultants. The ALJ stated that "[t]he opinion evidence [of all three consultants] is supported by and consistent with the overall evidence of record." (Tr. 24). The ALJ provided no specific discussion of either supportability or consistency, but generally cited to the benign mental status findings in Nurse Thorn's clinical records, Plaintiff's report to Dr. Rosenthal of her daily activities, and the consultants' respective opinions that she has no limitations in the paragraph B domains. (*See* Tr. 23-25). Although a one-sentence analysis of supportability and consistency might be adequate if the ALJ provides sufficient discussion of the underlying evidence on which the consulting physician relied (supportability) and the record as a whole (consistency), the Court concludes that the ALJ's succinct analysis is not substantially supported here. For example, with respect to the non-examining consultants, the PRTF form is internally inconsistent because the consultants list

Plaintiff's mental impairments as "severe" (implying at least one limitation at the "moderate" or greater level in the paragraph B domains). In addition, the ALJ provides no analysis of her view that the three consulting opinions are equally persuasive despite her view that their opinions that Plaintiff has *no limitations at all* in various paragraph B domains "may be slightly overstated," and concluding instead that Plaintiff has "no worse than 'mild'" limitations. (Tr. 24-25). Because the discussion of the mental health treatment records is so limited, the Court is left to guess at the ALJ's basis for that deviation.

Finally, Plaintiff criticizes the ALJ's rejection of the opinions of Nurse Thorn as "not persuasive." On March 14, 2022, Nurse Thorn completed a 3-page "Mental Impairment Questionnaire." On that form, she lists Plaintiff's diagnosis of "moderate, recurrent, major depressive disorder and generalized anxiety disorder." (Tr. 2085). The same form includes a check-mark list of Plaintiff's symptoms including "poor memory, sleep disturbance, social withdrawal/isolation, emotional lability, decreased energy, recurrent panic attacks, obsessive or compulsions, anhedonia, persistent irrational fears, generalized persistent anxiety, feelings of guilt/worthlessness, difficulty thinking or concentrating, and hostility/irritability." (Tr. 22, citing Tr. 2085).

In contrast to the consultants, Ms. Thorn endorses "moderate," "marked," and "extreme" limitations in all four paragraph B domains. She opines that Plaintiff has marked overall limitations in two functional domains. (*See* Tr. 2087). And in the domain of adapting and managing oneself, she endorses "extreme" limitation. (*Id.*) Only in the functional domain of being able "to learn, recall, or use information" (i.e., understanding, remembering or applying information) does Nurse Thorn assess only "mild" impairment, despite simultaneously opining that Plaintiff has a few moderate and marked limitations

within that domain. (Tr. 2086-2087). It is worth noting here that Nurse Thorn's opinions suggest Listing-level severity in paragraph B limitations.[19] In addition, Ms. Thorn opines that Plaintiff would likely be off task for "20% or more" of the work day, and would be absent from work due to either her "impairments or treatment" more than three times per month. (Tr. 22-24, Tr. 2085). She opines generally that Plaintiff is incapable of sustaining full-time work. (*Id.*) And in a brief statement that touches upon physical limitations, she opines that stress and anxiety increase Plaintiff's symptoms of irritable bowel syndrome ("IBS").[20] (Tr. 22, citing Tr. 2085)

After summarizing Ms. Thorn's many work-preclusive opinions, the ALJ rejected them. In so doing, the ALJ again cited to Ms. Thorn's objective mental status findings. In addition, the ALJ contrasted Ms. Thorn's opinions with the opinions of the three agency consultants. The ALJ reasoned:

> The opinion evidence presented by Nurse Thorn is not persuasive. There is no evidence to support the conclusions of Nurse Thorn that the claimant experiences "moderate," "marked," or "extreme" functional limitation due to a mental disorder. There is no evidence to support her estimations that the claimant would likely be 'off task' 20 percent of the time or more during a typical workday or that she would likely be absent from work more than three times per month. As noted, upon repeated examination, the claimant exhibited full affect, euthymic mood, normal psychomotor activity, and intact memory. She was cooperative, alert, and fully oriented (Exhibits 5F at 27, 9F at 9, 10F at 72, and 12F at 43). Thought content and thought process were normal. The claimant demonstrated good insight and good judgment (Exhibits 5F at 3, 7, 9, 12, 15, 18, 21, 24, and 27; 9F at 3, 6, and 9; 12F at 3, 6, 9, 12, 15, 18, 23, 25, 31, 34, 37, 40, and 42). The claimant's mental status was reported to be good (Exhibit 12F at 42). Examining psychologist Dr. Rosenthal found the claimant to be polite and cooperative. There was

---

[19]Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) may be satisfied by meeting the requirements of Paragraph A along with at least one "extreme" limitation in a Paragraph B area or two "marked" limitations in Paragraph B areas. Although Plaintiff does not argue Step 3 error, Nurse Thorn's opinions that Plaintiff has "marked" impairments in two areas and an "extreme" impairment in a third paragraph B area, arguably satisfy Listing level criteria.

[20]Plaintiff does not appear to have alleged IBS on her disability application or in this appeal.

no evidence of thought disturbance or mental confusion. There were no signs of psychosis. Dr. Rosenthal concluded that the claimant has no difficulty understanding assigned tasks. She exhibited no difficulty with attention and concentration. She reported no problems interacting with other persons. There is no evidence of the claimant having any difficulty coping with stress. The opinion evidence of Dr. Rosenthal is supported by and consistent with the overall evidence of record. It is persuasive with respect to the degree of mental limitation experienced by the claimant. Both DDD reviewing mental health sources, Dr. Rudy and Dr. Seleshi, concluded that the claimant does not have a "severe" mental impairment.

(Tr. 22-23).

With respect to the key factors of consistency and supportability, Plaintiff takes issue with the ALJ's statement that there was "no evidence" to support Nurse Thorn's opinions, given the ALJ's complete failure to discuss the narrative portions of Nurse Thorn's records. Given that remand is already required based on the ALJ's inadequate assessment of the physical RFC opinion evidence and articulation error concerning the consulting psychologists, the undersigned encourages the ALJ to provide greater articulation of Nurse Thorn's opinions as well.

### 3. The ALJ's Assessment of Plaintiff's Daily Activities

The assessment of daily activities contributed to the ALJ's overall adverse assessment of Plaintiff's subjective statements. (Tr. 29). Plaintiff argues that the ALJ committed reversible error in the manner in which she considered Plaintiff's daily activities by "overgeneralizing… and ignoring context." (Doc. 8 at 19, PageID 2214). The ALJ heavily relied on statements Plaintiff made to Dr. Rosenthal in June 2021, but the ALJ also questioned Plaintiff about any intervening changes in her activities. (Tr. 53-55). In response, Plaintiff testified to increased anxiety and panic attacks, with more time in her room, but confirmed that she continues to spend time either in-person, online, or by telephone with her boyfriend, son, father, and other friends. (Tr. 55). On appeal, Plaintiff

22

points to additional testimony she offered about how often she could engage in the daily activities she reported due to cardiac-related exertional fatigue and other symptoms, and the ALJ's failure to discuss that testimony. (*See* Tr. 55-58; *see also* Tr. 218-222).

While an ALJ's analysis of subjective statements is ordinarily given a great deal of deference, the reversible errors in this case may well have impacted the ALJ's analysis of Plaintiff's reported daily activities. On remand, therefore, the ALJ should re-examine Plaintiff's subjective reports, including with respect to daily activities.

### III.  Conclusion and Order

In her final claim of error, Plaintiff simply argues that the compilation of errors in this case require remand for further consideration. The Court agrees. For the reasons stated, **IT IS ORDERED THAT** Defendant's decision be **REVERSED and REMANDED** under sentence four for reconsideration of the evidence consistent with this opinion, including a new evidentiary hearing if appropriate, and that the above-captioned case be **CLOSED.**

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge